IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNELL MITCHELL<br>323 Barc;ay Court<br>Langhorne, PA 19047<br>         Plaintiff,<br>   v.<br>NATIONAL RAILROAD PASSENGER<br>CORP. a/k/a "AMTRAK"<br>30th Street Station<br>Philadelphia, PA 19104<br>         And<br>JENNIFER HAKEN-LAFTY<br>c/o NATIONAL RAILROAD<br>PASSENGER CORPORATION, a/k/a<br>"AMTRAK"<br>30th Street Station<br>Philadelphia, PA 19104<br>         And<br>MARIA FAULKNER<br>c/o NATIONAL RAILROAD<br>PASSENGER CORPORATION, a/k/a<br>30th Street Station<br>Philadelphia, PA 19104<br>         And<br>ANGELA SCHIAVELLO<br>c/o NATIONAL RAILROAD<br>PASSENGER CORPORATION, a/k/a<br>30th Street Station<br>Philadelphia, PA 19104<br>         Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br>NO:<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiff, Donnell Mitchell, by and through his undersigned counsel, through this Complaint hereby alleges against defendants National Railroad Passenger Corporation, Jennifer Haken-Lafty, Maria Faulkner and Angela Schiavello the following:

1

## PARTIES

1. Plaintiff, Donnell Mitchell, is an adult individual and citizen of the Commonwealth of Pennsylvania who resides at 323 Barclay Court, Langhorne, PA, 19047.

2. Defendant National Railroad Passenger Corporation ("Amtrak") is a corporation established by an Act of Congress of October 30, 1970, 84 Stat 1328 et seq. commonly known as Rail Passenger Service Act of 1970, and at all time material hereto, was engaged in owning and operating a line and system of railroads and railroad properties as a common carrier of goods and passengers for hire in interstate commerce and transportation in, through and between various states of the union and the District of Columbia, having a principal place of business located at 2955 Market Street, 30th Street Station, Philadelphia, Pennsylvania 19104

3. At the time of the defendant's FRSA violations, Mr. Mitchell was employed by Amtrak and qualified as an employee within the meaning of 49 U.S.C. Section 20109.

4. At all times relevant hereto, Defendant was acting through its agents, servants and employees, who were authorized and acting within the scope of their authority, course of employment, and under the direct control of Defendant.

5. Defendant Jennifer Haken-Lafty is an employee of Amtrak and was acting in the course and scope of her employment with Amtrak at all times described herein.

6. Defendant Maria Faulkner is an employee of Amtrak and was acting in the course and scope of her employment with Amtrak at all times described herein.

7. Defendant Angela Schiavello is an employee of Amtrak and was acting in the course and scope of her employment with Amtrak at all times described herein.

## NATURE OF ACTION

8. Mr. Mitchell brings this action against Amtrak pursuant to the employee protection provisions of the Federal Rail Safety Act ("FRSA" or "the Act"), 49 U.S.C. Section 20109, as amended.

9. The FRSA, 49 U.S.C. §20109, makes it unlawful for Amtrak and other interstate railroad, and their officers and employees, to take unfavorable personnel actions against an employee who engages in protected activity. *Arajuo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3rd Cir. 2013).

10. To establish an FRSA violation, an employee need only prove that his engaging in protected activity was a "contributory factor" to the adverse personnel action, meaning a factor which, "along or in connection with other factors, tends to affect in any way the outcome" of a decision; it does not require the employee to establish that the protected activity was "significant," "motivating," "substantial" or "predominate" in the adverse personnel action and does not require the employee prove a retaliatory motive." *Arajuo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir. 2013).

11. The FRSA makes it unlawful to, "discharge, demote, suspend, reprimand, or in any way discriminate" against an employee where such discrimination is due "in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done": (1) to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security, or gross fraud, waste, or abuse of Federal grants or other public funds intended to be used for railroad safety or security, if the information or assistance is provided to or an investigation

stemming from the provided information is conducted by--(C) a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct; or (2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security;

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction in this case pursuant to the Federal Railroad Safety Act, 49 U.S.C. Section 20109(d)(3) (FRSA).

13. Venue properly lies in the Eastern District of Pennsylvania because the cause of action herein pled occurred in or around 2955 Market Street, 30th Street Station, Philadelphia, Pennsylvania 19104 which address is located in the venue established for the District Court for the Eastern District of Pennsylvania.

14. All conditions precedent to the institution of this suit have been fulfilled.

15. On May 2, 2018, Mr. Mitchell filed a FRSA Complaint with OSHA. See Letter of Confirmation attached hereto as Exhibit 1. That was within 180 days from the date Mr. Mitchell was subjected to Defendant taking an adverse personnel action against him by way of termination.

16. OSHA commenced its investigation, and Mr. Mitchell fully cooperated with OSHA's investigation. However, OSHA did not issue a final decision within 210 days after the filing of the FRSA Complaint. The delay was not due to any bad faith on the part of Mr. Mitchell.

17. Pursuant to Section (d)(3) of the FRSA, Mr. Mitchell has a statutory right to bring an original action in a United States district court for a jury trial regarding the defendants' violations of the FRSA. 49 U.S.C. Section 20109(d)(3).

## FACTS

18. Under the Omnibus Transportation Employee Testing Act, the Department of Transportation is required to implement Drug and Alcohol testing programs within various transportation industries.

19. Drug and alcohol testing has been required by the Federal Railroad Administration (FRA) for railroad industry employees since 1986.

20. The general purpose of this program is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol and/or drugs.

21. For purposes of Part 219- Control of Alcohol and Drug Use, FRA designated its safety-sensitive employees to be those who perform service covered under the hours of service laws.

22. Effective June 12, 2017, Maintenance of Way employees as defined as "Roadway Worker" in Part 214.7 became subject to Part 219 requirements.

23. Effective on June 12, 2017, the new term "regulated service" included all hours of service employees and roadway workers, inclusive of "regulated Service" contractors and also individuals who may volunteer to perform regulated services for a railroad.

24. These generally include train and engine service employees involved in the movement of trains or engines (e.g. conductors, brakemen, switchmen, engineers, locomotive hostlers/helpers), dispatching employees who issue mandatory directives (e.g. train dispatchers, control operators), signal employees who inspect, repair, or maintain signal systems and maintenance of way employees performing duties of roadway workers as defined in Part 214.7.

25. Amtrak must adhere to the Omnibus Transportation Employee Testing Act.

26. As part of its compliance with the Omnibus Transportation Employee Testing Act, Amtrak created the position of Occupational Field Testing Specialist (OFTS).

27. The OFTS is responsible for the field management of drug and alcohol field testing consistent with Amtrak objectives and procedures and in accordance with all Federal laws and regulations.

28. This includes but is not limited to scheduling of random testing of Maintenance of Way employees, hours of service employees, management testing, Department of Transportation Testing and follow up.

29. The OFTS also ensures that engineering employees are tested in compliance with operating rules, federal regulations and safety by performing documented observations.

30. The OFTS also handles all deficiencies in a consistent and fair manner in accordance with the appropriate labor agreement, including removal from service.

31. The OFTS provides field supervisor direction on Amtrak's drug and alcohol policies and procedures at the direction of the Lead Occupational Field Testing Specialist.

32. Mr. Mitchell applied for the position of OFTS with Amtrak in or about August 2017.

33. Mr. Mitchell was hired by Amtrak effective 10/30/2017 in the full-time position of OFTS -90215839- Philadelphia at an annual salary of $78,000.

34. Mr. Mitchell was to report to Defendant Jennifer Haken-Lafty, Lead Occupational Field Testing Specialist, based in Philadelphia, PA (30th Street Station).

35. Prior to accepting the position with Amtrak, Mr. Mitchell worked for Examination Management Services Inc. as a field collector of DOT and non-DOT samples via testing of employees.

36. Accordingly, Mr. Mitchell was extremely familiar with DOT regulations for the collection of samples for drug and alcohol testing.

37. With Amtrak, Mr. Mitchell understood his job responsibilities to include the scheduling of the employee drug and alcohol testing, locating the employee, contacting the representative from the company responsible for testing and coordinating with the Amtrak employee's manager.

38. Mr. Mitchell was also responsible for protecting the integrity of the testing and ensuring proper adherence to testing procedures.

39. ADTS was a third party collection company that provided the collectors for the drug testing.

40. Mr. Mitchell experienced difficulties almost immediately upon starting. To wit, Mr. Mitchell was not provided the classroom training provided to others. Further Mr. Mitchell was given a computer but without network access. This created significant problems with scheduling.

41. During his first week of work, Mr. Mitchell was directed to shadow another employee each day.

42. On his very first day, Mr. Mitchell observed that the collector did not follow appropriate procedures; more specifically the chain of custody paperwork was completed prior to the actual sample being produced by the donor. This invalidates the chain of custody and more specifically violates Part 49 of DOT Policies and Procedures.

43. Mr. Mitchell advised the OFTS that he was shadowing (Oliver Salazar) of the problem. Mr. Salazar was completely unaware of this policy (or any of the DOT policies for that matter) related to the collection of donor specimens.

44. Mr. Mitchell also advised his supervisor, Defendant Lafty, of the collection problems. However, Defendant Lafty responded that it was "not really our job." She also told Mr. Mitchell that he should just "let the collector do his job."

45. Several days later, Mr. Mitchell shadowed a different OFTS, Gwen Brown.

46. At that collection site, Mr. Mitchell observed the collector not following appropriate procedure. More specifically, the collector employed the use of a multiple stall bathroom, did not watch or secure the water sources in the bathroom, did not tape off sinks to restrict the use of water and did not place blue dye in other commodes.

47. Mr. Mitchell advised Ms. Brown of the problems. Ms. Brown stated that she "had a feeling there was a problem with this since July." It became clear to Mr. Mitchell that OFTS employees were not being educated by Amtrak appropriately to comply with regulations.

48. On or about November 6, 2017, all OFTS were called to a meeting with Defendant Lafty at 30th Street Station.

49. At that meeting several OFTS employees raised the concern to Defendant Lafty that different collectors were engaging in different procedures for testing. The OFTS employees asked Defendant Lafty to clarify what was the correct procedure.

50. Defendant Lafty answered that "there are multiple ways." This showed that Defendant Lafty did not understand proper DOT procedure for collection of samples

51. Even more shockingly, Defendant Lafty told the OFTS employees that "they should not get involved in the process," and that they should "stay in your swim lane."

52. On or about November 8, 2017, while out in the field on his own, Mr. Mitchell observed a collector failing to force a donor to make a first attempt where the donor stated he could not provide a sample. The collector allowed the donor to go into locker room by himself without supervision to make the attempt and provide a final sample. This is against DOT regulations.

53. Mr. Mitchell attempted via text to contact Defendant Lafty to inform her of the problem. However, Defendant Lafty did not respond.

54. The next day, Mr. Mitchell was visited by Defendant Lafty and Defendant Maria Faulkner, Manager-Business Services. Mr. Mitchell was told that he was upsetting managers because he was telling collectors that they were doing the job wrong.

55. Mr. Mitchell asked Defendant Lafty what he should have done. Defendant Lafty told Mr. Mitchell that he should have contacted her and/or Defendant Faulkner. As stated above, Mr. Mitchell had attempted that but to no avail.

56. Mr. Mitchell was then told by Defendant Faulkner that he did do the right thing.

57. Defendant Lafty then stated she did not understand what Mr. Mitchell was talking about with regard to proper testing procedures and that she was just in charge of scheduling testing.

58. The following day, Mr. Mitchell met again with Defendant Lafty. She told Mr. Mitchell that he was "messing up the flow of testing." Mr. Mitchell asked Defendant Lafty "what was more important… compliance or the number of test being done?" Defendant Lafty stated unequivocally that the number of tests completed was the most important thing. Defendant Lafty then stated mockingly "I guess we have been doing everything wrong since July."

59. In mid-November, Debra Jowers, an Amtrak Designated Employee Representative asked Mr. Mitchell if he could do post-accident tissue samples involving fatalities. Mr. Mitchell responded that he could.

60. Ms. Jowers also asked Mr. Mitchell whether he could conduct training on DOT regulations for collections. This occurred in front of Defendant Lafty.

61. Following the meeting with Ms. Jowers, Defendant Lafty told Mr. Mitchell that she "didn't care what Ms. Jowers said, [Mr. Mitchell] was not going to conduct post-accident tissue sampling."

62. In a follow-up meeting with Defendant Lafty and Andrew (LNU), the Medical Review Officer, Mr. Mitchell was asked why he disliked ADTS. ADTS was the collection company that provided the collectors for the drug testing.

63. Mr. Mitchell explained that the collectors were not following DOT regulations.

64. Defendant Lafty told Mr. Mitchell that he was acting like a collector and that he needed to stop.

65. Feeling defeated and shut down from his job duties, Mr. Mitchell told Defendant Lafty that he would not say anything else about collection.

66. Throughout the rest of November, Mr. Mitchell continued to receive calls from other OFTS employees. Mr. Mitchell received approximately 6-8 calls inquiring whether certain procedures by collectors were proper. Mr. Mitchell responded to each inquiry by telling the OFTS employee to contact Defendant Lafty.

67. Continuing through the end of November, Mr. Mitchell's job was made extremely difficult because of a failure to provide access to the scheduling system and failure to provide cost center codes. Mr. Mitchell was finally showed by Ms. Faulkner how to access the scheduling system.

68. At a staff meeting on or about December 5, 2017, other OFTS employees again asked questions related to proper collection procedure. Apparently recognizing that Mr. Mitchell knew the most about proper procedure, Mr. Mitchell was told to respond to these questions by Defendant Lafty and Andrew.

69. Nevertheless, Ms. Lafty repeated her mantra that the most important thing was the quantity not the quality of the testing. More specifically, Defendant Lafty told the OFTS

employees to "get the numbers done." She also stated that "DOT only gets involved if the tests are not done."

70. During the remainder of December 2017, Mr. Mitchell continued to encounter obstacles with regard to performing his job duties including the failure of other Amtrak managers to assist in scheduling employees for testing and failure to provide appropriate testing locations.

71. On January 5, 2018, Mr. Mitchell was called to a meeting with Defendants Lafty, Faulkner and Angela Schiavello, HR representative.

72. At that meeting, without any prior warning, progressive discipline or foundation in fact, Mr. Mitchell was told that he was being terminated from his employment.

73. When Mr. Mitchell asked why he was being terminated he was told that Amtrak had "lost confidence" in his ability to perform the job.

74. Mr. Mitchell believes that this proffered reason lacked any footing and was in fact retaliatory in nature.

75. More specifically, Mr. Mitchell believes that he was retaliated against for raising questions and reporting deficiencies in Amtrak's implementation of drug testing procedures as required under the Omnibus Transportation Testing Act.

76. The Defendants violated the Federal Railroad Safety Act, 49 U.S.C. § 20109 (b)(1)(A) by reprimanding and discharging Mr. Mitchell for reporting, in good faith, a hazardous safety condition.

77. More specifically, the hazardous safety condition was the failure to properly administer employee drug and alcohol testing as required by law.

## FRSA CAUSE OF ACTION

78. Mr. Mitchell adopts by reference and realleges each and every allegation set forth in paragraphs 1 through 77 of this Complaint with the same force and effect as if set forth under this cause of action.

79. Mr. Mitchell engaged in protected activity under the FRSA when he raised questions and reporting deficiencies in Amtrak's implementation of drug testing procedures as required under the Omnibus Transportation Testing Act as further described above.

80. The Defendants had knowledge of all the protected activities as further described above.

81. The Defendants took adverse or unfavorable actions against Mr. Mitchell in whole or in part due to his protected activities when it terminated Mr. Mitchell from his employment. In so doing, the Defendants acted with reckless disregard for the law and with complete indifference to Mr. Mitchell's rights under the FRSA.

**WHEREFORE**, in order to encourage employees to freely report conduct reasonably believed to constitute a violation of any Federal law, rule or regulation relating to railroad safety without fear of any retaliation, thereby ensuring the Federal Rail Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area of our nation's railroad operations, Mr. Mitchell demands a Judgment under the FRSA for all relief necessary to make him whole, and order that

  (a) Defendants compensate Mr. Mitchell for the wages and other benefits and emoluments of employment lost, because of their unlawful conduct;

(b)     Defendants pay to Mr. Mitchell compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses as allowable;

(c)     Defendants pay to Plaintiff punitive damages pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

(d) The Court award such other relief as is deemed just and proper.

Plaintiff Demands Trial by Jury

                              DUFFY NORTH

               By: _____
                              Joshua S. Ganz, Esquire
                              Attorney I.D No. 85838
                              Christopher Manno, Esquire
                              Attorney I.D. No. 326192
                              104 N. York Road
                              Hatboro, PA  19040
                              (215) 675-7300
                              jganz@duffynorth.com
                              Attorneys for Plaintiff, Donnell Mitchell